**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JOHN BOLASKY,

                               Plaintiff,

-vs-                                              Case No.  6:06-cv-520-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                               Defendant.

_____

**ORDER**

        This cause came on for consideration without oral argument on the Complaint filed by

John Bolasky seeking review of the final decision of the Commissioner of Social Security denying

his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and

filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 9,

10.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under

28 U.S.C. § 636(c).  Doc. No. 16.

I.      **PROCEDURAL HISTORY.**

        In 2002, Bolasky applied for disability benefits under the Federal Old Age, Survivors and

Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.* (sometimes referred to herein as

the Act).  R. 45-47.  The application alleged that Bolasky had become disabled on May 30, 2000.

R. 45.  Bolasky's application was denied initially and on reconsideration.  R. 34-35, 40-42.

Bolasky requested a hearing before an administrative law judge (ALJ).  R. 33.  An ALJ held a hearing on August 11, 2005.  R. 381.  Bolasky, represented by an attorney, testified at the hearing.  R. 383-409.

After considering the testimony and the medical evidence presented, the ALJ determined that Bolasky was insured through December 31, 2003.  R. 14.  The ALJ found that Bolasky had not engaged in substantial gainful activity since May 30, 2000, the alleged onset date of his disability.  R. 14, 20.

The ALJ concluded that the medical evidence showed that Bolasky was status-post four left knee surgeries, including an ACL tear repair, Genzyme biopsy for a full thickness osteochondral[1] lesion with secondary reimplantation, and the repair of a quadriceps tendon rupture.  R. 15.  Bolasky also was status-post Adult Respiratory Distress Syndrome (ARDS)[2] with respiratory failure and mild chronic obstructive pulmonary disease, and had coronary artery disease, type II diabetes mellitus, obesity, and a depressive disorder.  R. 15.  The ALJ found these impairments severe.  R. 15.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[3]  R. 15, 17.  The ALJ concluded that Bolasky's mental impairment would result in mild restriction of activities of daily living, mild

---

[1] Osteochondral is the inflammation of a bone and its cartilage.  *Stedman's Medical Dictionary* 1267 (26th ed. 1995) (*Stedman's*).

[2] The medical evidence in the record sometimes refers to ARDS as Acute Respiratory Distress Syndrome.  *See*, *e.g.*, R. 148.

[3] The Code of Federal Regulations "contains a Listing of Impairments . . . specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

difficulties with social functioning, and moderate difficulties maintaining concentration, persistence or pace.  R. 19.  After considering all of the evidence in the record, the ALJ found that Bolasky had the residual functional capacity (RFC) to perform unskilled light work,[4] specifically the following: "lift and carry 20 pounds occasionally and up to 10 pounds frequently[,] . . . stand and/or walk up to 6 hours in an 8-hour workday, and . . . sit up 2 hours in an 8-hour work day."  R. 18.  He could "occasionally climb, balance, stoop, kneel, crouch, and crawl[,]" and "should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation."  R. 18.  The ALJ also found that Bolasky would be moderately limited in understanding, remembering, carrying out detailed instructions, maintaining concentration, completing a normal workday without interruptions from psychological based symptoms, and performing at a consistent pace.  R. 18-19.

In reaching this decision, the ALJ considered the opinions of Bolasky's treating physicians. R. 17.  The ALJ found that none of these doctors' limitations would prevent Bolasky from performing work activity for a twelve-month period.  R. 17.  The ALJ also found that while Bolasky had limitations arising from pain and other subjective symptoms, Bolasky's testimony about the extent of those limitations was not fully credible because "the record . . . shows that he recuperated from each of the 4 knee surgeries within a short period and he returned to weight-bearing status in less than 12 months from each surgery.  In addition, the record does not show such a marked diminished range of motion or muscle atrophy as would accompany the alleged disability on or before December 31, 2003."  R. 18.

---

[4] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

Because Bolasky's past relevant work required him to perform at least at a medium level of exertion, the ALJ concluded that Bolasky could not return to his past relevant work.  R. 19.  The ALJ cited Social Security Ruling (SSR) 83-14 to support his finding that the postural limitations in Bolasky's RFC would have little or no effect on his ability to perform unskilled light work.  He cited SSR 85-15 to support his finding that Bolasky's mental functional limitations also would not reduce the occupational base of unskilled light work that Bolasky could perform. Relying on the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, as a framework, the ALJ concluded that Bolasky could perform substantially all of the light work requirements and that his nonexertional limitations would not reduce his occupational base.  The ALJ found that there are jobs existing in significant numbers in the national economy that Bolasky could perform. R. 20.  Accordingly, the ALJ concluded that Bolasky was not disabled.  R. 20.

Bolasky requested review of the ALJ's decision.  R. 8.  On February 10, 2006, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 5-7.   Bolasky timely sought review of the decision by this Court.  Doc. No. 1.

**II.     JURISDICTION.**

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Bolasky's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

### III.     STATEMENT OF FACTS.

The ALJ and the parties in their respective memoranda have discussed in detail the

evidence of record.  Accordingly, I will only summarize the relevant facts.

Bolasky was born on July 20, 1956.  R. 384.  He is 5'3" tall and weighed approximately

260 pounds at the time of the hearing.  R. 386.

Bolasky attended school only through the sixth grade.  R. 384.  Bolasky previously worked

as a delivery truck driver, in which job he had to lift at least 100 pounds.  R. 385. He also worked

as a laborer for the railroad, which also required heavy lifting.  R. 386.

Bolasky stopped working in March 2000 after an accident that occurred while working for

the railroad.  R. 387.  While coming down a ladder to get off a train, the ladder moved and

Bolasky fell and tore his anterior cruciate ligament (ACL) and damaged cartilage in his left knee.

R. 127, 387.  In September 2000, he had surgery to reconstruct the ACL of his left knee.  R. 145,

387.  During that surgery, Bolasky developed ARDS and methicillin-resistant staphylococus

aureus (MRSA) pneumonia and had to be placed on a ventilator.  R. 134-40, 388. Tests taken

while he was hospitalized revealed that Bolasky had chronic obstructive pulmonary disease

(COPD), severe gastroesophageal reflux (GERD), and mild congestive heart failure.  R. 132, 157.

He was discharged on October 4, 2000, with instructions to quit smoking.  He was prescribed an

inhaler.  R. 202.

After the knee surgery, James J. York, M.D., the treating orthopaedist, indicated that

Bolasky could not work before March 1, 2001.  R. 233.  Bolasky participated in physical therapy

and was fitted with a knee brace.  R. 231-33.  Dr. York released Bolasky to return to work on March 29, 2001. R. 230.

On September 26, 2001, Bolasky returned to Dr. York complaining of stiffness, pain and diminished range of motion in his left knee.  Dr. York's impression was that Bolasky had chondromalacia (damage to the cartilage) under his left kneecap.  R. 229.  Arthroscopic surgery to debride and biopsy the knee was performed in October 2001.  R. 204.  Dr. York required that Bolasky not return to work for nine months.  R. 228.  After the surgery, he had some effusion in the joint but minimal pain.  R. 226.

Surgery to implant cartilage in Bolasky's left knee was delayed when Bolasky developed upper respiratory tract symptoms.  R. 224-25.  The surgery was finally performed in April 2002. R. 211.  Dr. York observed in May that a portion of the wound was slow to heal; he instructed Bolasky to continue to wear a protective knee brace.  R. 223.  In June, Bolasky was attempting to walk without use of a brace or other ambulatory aid.  Dr. York recommended that Bolasky continue to use a cane most of the time.  R. 222.  In September 2002, Bolasky reported that he was doing some walking and leg raising exercises.  Dr. York observed that Bolasky had minimal symptoms and was making satisfactory progress. R. 220.

By October 2002, Bolasky was walking well without any assistive device.  However, he fell down in November 2002 and tore his left quadriceps tendon.  R. 219.  Dr. York performed surgery to repair the tendon on November 8, 2002.  R. 214.  Dr. York instructed Bolasky to wear a knee immobilizer and not to walk on or move his left knee.  R. 216.  Dr. York wrote in 2005 that

Bolasky was unable to work in any capacity between June 8, 2000 and November 20, 2002, due to the injury to his left knee and subsequent surgeries.  R. 354.

Bolasky sought treatment from John F. Wiley, M.D., in March and April 2003 for complaints of shortness of breath (dyspnea), lack of energy and problems sleeping.  Dr. Wiley's impression was that Bolasky had an infection or bronchospasm and prescribed medication.  R. 257-59. In May 2003, Dr. Wiley opined that Bolasky's breathing problems were related to depression and anxiety.  R. 252-53.

Daljeet S. Sidhu, M.D., examined Bolasky in April 2003, at the request of the SSA.  At that time, he was not in acute respiratory distress although he had shortness of breath during a normal conversation.  Although he complained of left knee pain, range of motion was good, and he could bear weight normally with the use of an ambulatory aid.  Dr. Sidhu's impression was that Bolasky suffered from obesity and dyspnea secondary to obesity and COPD.  R. 241-43.

A physician who reviewed Bolasky's records at the request of the SSA opined in April 2003 that Bolasky could lift up to fifty pounds occasionally and twenty pounds frequently.  He could sit, stand, or walk for about six hours in an eight-hour workday, with no other functional limitations.  R. 244-51.

In November 2003, Mikhael Taller, M.D., performed a psychiatric evaluation of Bolasky at the request of the SSA.  During the examination, Bolasky reported that he had started feeling depressed after he had ARDS. He complained of feeling sad, not sleeping well, and having low energy and poor concentration.  He reported that it was difficult for him to walk or stand due to left knee pain.  He was able to care for his personal hygiene, but his wife took care of household

chores.  Bolasky went grocery shopping once a week with his wife, and clothes shopping about once a month.  He felt comfortable with people, and he was able to follow simple instructions.  Dr. Taller's diagnosis was depressive disorder not otherwise specified.  R. 265-70.

In December 2003, Bolasky sought treatment for chest pain radiating into his left arm. Paul Young-Hyman, M.D., observed after testing that Bolasky had inferior wall ischemia.  R. 319-20.  A left heart catheterization and stent placement was performed on December 12, 2003.  The procedure revealed that Bolasky had coronary artery disease. R. 272.  Dr. Young-Hyman's diagnosis following the surgery was coronary artery disease, diabetes, hyperlipidemia, restrictive lung disease and chronic knee arthralgia.  R. 317-18.  Bolasky continued to smoke cigarettes despite being directed to cease.  R. 315.  In February 2004, Dr. Young-Hyman noted that Bolasky had not had further ischemic heart disease, but continued to suffer from diabetes, hyperlipidemia and restrictive lung disease.  He opined that Bolasky's condition was stable but chronic, and that he should be considered disabled due to his cardiovascular disease.  R. 315-16.

Dale L. Peterson, Ph.D., reviewed Bolasky's records in December 2003 and prepared mental RFC assessments.  R. 295-312. He concluded that Bolasky would have only mild limitations in activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace.  R. 305.  He further concluded that Bolasky would be moderately limited in the following abilities: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; and completing a normal workday and week without interruptions from psychologically based

symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  R. 309-10.

In May 2004, Bruce F. Hertz, Ph.D., also opined about Bolasky's mental RFC after a review of his records.  He concluded that Bolasky would have moderate limitations in activities of daily living and maintaining concentration, persistence, or pace, and mild limitations in maintaining social functioning.  In other respects, his conclusions were consistent with those of Dr. Peterson.  R. 336-53.

In May 2004, a doctor whose signature is illegible completed a physical RFC assessment after reviewing Bolasky's medical records.  The doctor opined that Bolasky could lift up to twenty pounds occasionally and ten pounds frequently. He could sit, stand, or walk for about six hours in an eight-hour workday.  He could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. He should avoid concentrated exposures to fumes, odors, dusts, gases, and poor ventilation. R. 328-35.

At the hearing before the ALJ in August 2005, Bolasky testified that his knee constantly hurt and that he had a hard time walking for more than one-half a block.  R. 391-93.  He could not stand for longer than ten minutes.  R. 392-93.  He could not sit for longer than a half hour before becoming anxious.  R. 392-93.   He could lift a gallon of milk and estimated that he could lift up to twenty pounds.  R. 394.

He was short-winded and needed to take Albuterol[5] through a breathing machine three times a day.  R. 395.   He also had chest pains. R. 396.   He did not have much energy.  R. 400.

---

[5] Albuterol relaxes muscles in the airways to improve breathing.  Drugs.com, *albuterol*, http://www.drugs.com/mtm/albuterol.html (last visited Sept. 18, 2007).

Because of difficulties sleeping at night, he took two to three hour-long naps during the day.  R. 401.  He could not concentrate for long, which caused difficulties with reading  R. 402.

On a typical day, Bolasky woke up around 4:00 a.m. or 5:00 a.m. after awaking multiple times during the night.  He would sit around his house and watch television or listen to music.  He also tried to walk.  R. 403.  Bolasky tried to help with the household chores. He folded clothes and put dishes in the dishwasher.  R. 405.  Sometimes he visited his daughter.  R. 404.  He had recently begun going to church.  R. 405.  He did not drive.  R. 404-05.  Mrs. Bolasky submitted written reports of Bolasky's daily activities.  She noted, among other things, that Bolasky had panic attacks, was irritable, and had difficulty concentrating.  *See* R. 91-99, 106-13, 117-18.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  In a case under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

-10-

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206,

-11-

1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.    ANALYSIS.

Bolasky asserts that the ALJ erred by failing to solicit the testimony of a vocational expert (VE) at step five of the sequential evaluation process.  Bolasky also asserts that the ALJ's credibility finding is not based on the substantial evidence, and that the ALJ failed to consider the lay evidence of record.  These are the only issues subject to review.[6]

I address in detail only the argument that the ALJ erred by failing to call upon a VE at step five of the sequential evaluation process, because this issue is dispositive.  Bolasky contends that when, as here, an ALJ finds that the claimant has nonexertional impairments that limit the ability to work at a given exertional level, the ALJ must call upon a VE to assess whether there is work that the claimant can perform that is available in the national economy.  The Commissioner contends that use of a VE is not necessary when, as here, the ALJ relied upon social security rulings to determine that the nonexertional limitations did not significantly limit the claimant's basic work activities.

Before the Grids were promulgated in 1979, the preferred method of determining whether there was work available that a social security claimant could perform was through the testimony of a VE.  *See Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir. 1981).  After the United States Supreme Court approved use of the Grids in appropriate cases, *see Heckler v. Campbell*, 461 U.S.

---

[6] The parties were advised that issues not specifically raised would be waived.  Doc. No. 11 at 2.

-13-

458 (1983), three-judge panels in the Eleventh Circuit began to address whether the Grids could be relied upon at step five of the sequential evaluation process when the claimant had nonexertional impairments that limited his work skills.

The law that developed in this circuit requires that the ALJ initially determine whether the claimant's alleged nonexertional impairments limit the ability to work; if they do not, then exclusive reliance on the Grids at step five of the evaluation process is appropriate. *See Reeves v. Heckler*, 734 F.2d 519, 524 (11th Cir. 1984) (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 537 (6th Cir. 1981)); *see also Broz v. Schweiker*, 677 F.2d 1351, 1363 (11th Cir. 1982) (remanding for consideration whether a claimant's nonexertional impairments significantly limited his basic work skills, and then, whether the Grids could be used), *vacated, Heckler v. Broz*, 461 U.S. 952 (1983), *adhered to on remand, Broz v. Heckler*, 711 F.2d 957 (11th Cir. 1983), *modified in other respects*, 721 F.2d 1297 (11th Cir. 1983). However, if the ALJ finds that the claimant's nonexertional impairments significantly limit the claimant's basic work skills, otherwise stated as precluding the wide range of work at a given exertional level, then exclusive reliance on the Grids is not permitted. *See Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004) (citing *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985)). Rather, the ALJ must turn to VE testimony regarding the specific jobs that the claimant can perform in light of the claimant's functional capacity. *See id.* at 1243; *Welch v. Bowen*, 854 F.2d 436, 439-40 (11th Cir. 1988); *Gibson v. Heckler*, 762 F.2d 1516, 1521-22 (11th Cir. 1985).

The ALJ's decision that nonexertional impairments do not significantly limit basic work skills (that is, do not preclude a wide range of work at a given exertional level) must be supported

by substantial evidence in the record.  For example, in *Allen v. Sullivan*, 880 F.2d 1200, 1202

(11th Cir. 1989), the ALJ found that the claimant had nonexertional impairments arising from

borderline intellectual functioning and a dysthymic disorder that precluded her from performing

complex tasks and working under extraordinary stress.  The ALJ concluded that these

nonexertional limitations only slightly diminished the claimant's capacity to perform light work

and relied upon the Grids to conclude that there was work available that the claimant could

perform.  The Eleventh Circuit reversed the decision, holding that use of the Grids was

inappropriate.  The Court explained as follows: "Absent testimony from a vocational expert, the

ALJ's conclusion that appellant's mental limitations do not significantly compromise her basic

work skills or are not severe enough to preclude her from performing a wide range of light work is

not supported by substantial evidence." *Id.* at 1202.

Similarly, in *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992), the ALJ found that the

claimant had a seizure disorder that resulted in a nonexertional impairment limiting his ability to

work around unprotected heights or hazardous machinery.  The ALJ concluded that these

nonexertional limitations did not reduce the range of light work available to the claimant.  The

court reversed this decision, emphasizing that "'it is only when the claimant can clearly do

unlimited types of light work, . . . that it is unnecessary to call a vocational expert to establish

whether the claimant can perform work which exists in the national economy.'" *Id.* at 839

(quoting *Allen v. Sullivan,* 880 F.2d 1200, 1202 (11th Cir. 1989), and *Ferguson v. Schweiker*, 641

F.2d 243, 248 (5th Cir. Unit A March 1981)).

-15-

In the present case, the ALJ relied upon SSR 83-14 and SSR 85-15 to conclude that Bolasky's mental, postural, and environmental limitations did not significantly limit his ability to perform unskilled light work.[7]  The Commissioner did not cite any Eleventh Circuit or Supreme Court decision in which a court approved reliance on a social security ruling, without other evidence, to support such a finding if such use was challenged.  Under the law discussed above, the rule in this circuit appears to be that when the ALJ finds that nonexertional impairments exist, VE testimony is necessary to support an ALJ's conclusion that those nonexertional impairments do not significantly limit basic work skills.  *See, e.g.*, *Bouie v. Astrue*, 226 Fed. Appx. 892, 894 (11th Cir. 2007)("VE testimony is the preferred method for introducing independent evidence of the existence of jobs in the national economy that the claimant can perform.").[8]

Accordingly, remand is required to permit the Commissioner to obtain VE testimony to determine whether Bolasky's nonexertional limitations significantly impair his ability to perform work at a given exertional level.  If they do, then exclusive reliance on the Grids is improper.

On remand, the ALJ should also consider all of the evidence of record, including medical evidence that Bolasky was required to use an assistive device during many periods, and Mrs. Bolasky's reports regarding Bolasky's activities of daily living.  If the ALJ concludes that

---

[7]  SSR 85-15 is inapplicable in the present case because it addresses claimants who have only nonexertional impairments, while Bolasky has both exertional and nonexertional impairments.  With respect to postural limitations, Bolasky cited to the demands of specific jobs within the category of unskilled, light work that exceed his RFC, as determined by the ALJ.  *See* Doc. No. 18 at 18-19.

[8]  The United States Court of Appeals for the Third Circuit has wrestled with the question of when, and how, the SSA may appropriately rely upon SSRs in lieu of vocational testimony.  *See, e.g., Allen v. Barnhart,* 417 F.3d 396, 401-08 (3d Cir. 2005); *Sykes v. Apfel*, 228 F.3d 259 (3d Cir. 2000).

Bolasky's testimony about his limitations is not credible, he must articulate specific and adequate reasons supported by evidence in the record for that decision.

## VI.   CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 19th, 2007.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties